UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

OTKRITIE INTERNATIONAL
INVESTMENT MANAGEMENT LIMITED,
a company incorporated in the British Virgin
Islands,

OTKRITIE SECURITIES LIMITED,
a company incorporated in England and Wales,
and

OTKRITIE FINANCIAL CORPORATION JSC,
a company incorporated in the Russian Federation,

To Issue Subpoenas for the Production of
Documents and Testimony for Use in a Foreign
Proceeding.

Civil Action No.12-MC-



12 MISC 00382

## DECLARATION OF MICHAEL C. MILLER IN SUPPORT OF SEVENTH APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND TESTIMONY FOR USE IN A FOREIGN PROCEEDING

I, Michael C. Miller, hereby declare as follows:

1. I am an attorney admitted to practice before this Court and a member of the firm Steptoe & Johnson LLP, counsel to Otkritie International Investment Management Limited ("Otkritie Management"), Otkritie Securities Limited ("OSL"), and Otkritie Financial Corporation JSC ("Otkritie Financial," and collectively, "the Otkritie Entities" or "Applicants") in the above-captioned proceeding.

2. I make this Declaration in support of the accompanying seventh application ("Seventh Application") for an Order under 28 U.S.C. § 1782 ("Section 1782"), directing BGC Financial Group, Inc. (hereinafter, "BGC Financial" or "Respondent") to produce documents and testimony responsive to the subpoenas annexed hereto as "Exhibits 1 and 2."

3. This Application follows six previously-granted applications for judicial assistance, filed on January 4, February 21, April 13, May 24, August 6, and November 15, 2012 respectively. *See In re Application of Otkritie Int'l Invest. Mgmt. Ltd. et al. to Issue Subpoenas for the Production of Documents for Use in a Foreign Proceeding*, at DE 9, 13, No. 12-MC-1 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 8, No. 12-MC-118 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-177 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 8, No. 12-MC-262 (S.D.N.Y 2012); *In re Application of Otkritie*, at DE 5, No. 12-MC-374 (S.D.N.Y 2012).

4. Applicants are plaintiffs in a civil fraud action pending in the High Court of Justice, Queen's Bench Division, in the United Kingdom, captioned *Otkritie International Investment Management Ltd. et al. v. Urumov et al.*, 2011 Folio 1182 (hereinafter, "the U.K. Action"). *See, e.g., In re Application of Otkritie*, 12-MC-1, at DE 1 ¶¶ 1, 10-11.

5. The primary goal of the first six applications was to trace the dissipation of misappropriated funds in support of the U.K. Action and Applicants' worldwide asset freezing efforts. To that end, Applicants sought primarily transactional records from banks located in the District and suspected to have unwittingly facilitated a fraud on Applicants orchestrated by Applicants' former employee, Georgy Urumov ("Urumov"). This Seventh Application has a slightly different focus. With this Application, Applicants' aim to resolve outstanding questions about how, and from whom, Urumov and his co-conspirators sourced and aggregated the securities that were used to defraud Applicants.

6. Unless otherwise stated, this Declaration is based upon my personal knowledge as obtained through communications with third-parties having direct knowledge, including U.K. counsel to the Otkritie Entities, and a review of documents produced in connection with the U.K. Action and related proceedings in the U.K and in other jurisdictions.

7. **Summary of U.S. Discovery Results:** In the U.K. Action, Applicants assert claims against Urumov, a former London-based OSL employee, Urumov's wife Yulia Balk, shell companies owned and controlled by Urumov, and other individuals and entities acting in concert with Urumov, including, among others, Otkritie employees Ruslan Pinaev ("Pinaev"), Sergey Kondratyuk ("Kondratyuk") and Yevgueni Jemai ("Jemai"), and Vladimir Gersamia ("Gersamia") of Threadneedle Asset Management ("Threadneedle"), for, *inter alia*, breach of fiduciary duty, breach of contract, deceit, conspiracy, accounting, tracing and restitution. In relevant part, Applicants allege that Urumov and his co-conspirators were the masterminds behind an approximately $160 million fraud on the Otkritie Entities involving certain Argentinean GDP warrants (hereinafter, "the Warrants Fraud").

8. The assistance this Court has already provided pursuant to 28 U.S.C. § 1782 has been considerable. Subpoenas issued in connection with the Original, Second, Third, Fourth, and Fifth Applications have yielded literally thousands of pages of documents with information relating to the fraud perpetrated on Applicants. These documents have not only confirmed Applicants' suspicions about the movement of funds in the wake of the Warrants Fraud; they have shed new light on the darker corners of the co-conspirators' asset concealment strategy.

9. A color-coded chart attached hereto as "Exhibit 3" summarizes the achievements of previous discovery applications. Very briefly, disclosures resulting from the First and Second Applications, coded in green, identified and confirmed the movement of $150 million in Warrants Fraud proceeds through the accounts of Gemini Investment Fund Limited ("Gemini") at A.B. Bank Snoras ("Snoras"), a now insolvent Lithuanian bank, and Latvijas Krajbanka ("Krajbanka"), a now insolvent Latvian bank. The Third Application, represented in blue, traced the dissipation by co-conspirator Gersamia of $10.1 million in Warrants Fraud proceeds through various entities including Belux Company (Hong Kong) Limited, Templewood Capital Limited,

Jaspen Capital Partners Limited, KD Shipping Co. Limited Inc., and Tremlett International Ltd. The Fourth Application, coded in red, traced the dissipation of Warrants Fraud proceeds from accounts held by a Ukrainian company, Donetsk Steel, Andriy Supranonok, the CEO of Jaspen and a suspected beneficiary of the Warrants Fraud, and a Tajikistan company called Silver LLC belonging to Jemai's father.

10. Discovery relating to the Fifth Application, coded in purple, is ongoing, but has already yielded valuable information concerning the co-conspirators' efforts to broker a sale of the Warrants from Otkritie to Threadneedle.

11. Applicants' Sixth Application was just granted on November 15, 2012. It concerns the dissipation of proceeds of the Warrants Fraud via Gemini and affiliated entities and persons. Discovery pursuant to that application has only just begun.

12. **Scope and Purpose of Seventh Application**: This Seventh Application is based on new information concerning the co-conspirators' sourcing of the Argentinean GDP Warrants in the lead up to the Warrants Fraud.

13. A special U.K. discovery proceeding commenced against U.K.-based BGC Brokers, L.P. ("BGC Brokers") earlier this year revealed that New York-based affiliate "BGC Financial, Inc." may have unwittingly provided the co-conspirators with at least 250 million of the Warrants used in the Warrants Fraud.

14. Corporate records indicate that there is no U.S.-based BGC entity registered under the name BGC Financial, Inc. *See* BGC Partners, Inc. Form 10-K, a copy of which is attached hereto as "Exhibit 4." Applicants believe that the U.S.-based BGC entity that BGC Brokers intended to identify was BGC Financial Group, Inc., the Respondent.

15. Applicants seek to obtain from the Respondent, *inter alia*, documents concerning trading in the Argentinean Warrants to which it was a party, from January 2010 to August 2011,

communications relating to the same and testimony concerning these issues. Applicants believe that such information will further confirm the co-conspirators' liability and might reveal still unknown aiders and abettors, including those entities or persons from whom BGC Financial obtained the Warrants it later resold to BGC Brokers.

16. **The Otkritie Entities:** Otkritie Financial is the parent company of an international banking and finance group centered in Russia. *See* Particulars of Claim, dated November 18, 2011, ¶ 1.1, a copy is annexed hereto as "Exhibit 5." Otkritie Financial was established in 1995 and has grown rapidly. Today, Otkritie Financial is one of the leading banking institutions in Russia with over 240 branches.

17. Otkritie Management is a subsidiary of Otkritie Financial, incorporated in the British Virgin Islands. *See id.* ¶ 1.2.

18. Otkritie Management acts as an investment holding company and provider of finance to the Otkritie group of companies. *Id.*

19. OSL is a subsidiary of London-based Otkritie Financial, whose main areas of expertise are securities brokerage, portfolio management, financing and loans on securities, the issuing and cancellation of deposit securities, and the currency market. *Id.* ¶ 1.3.

20. **Georgy Urumov:** From February 2011 until he was suspended on September 8, 2011, Urumov was a trader in fixed income securities in OSL's London office. *See id.* ¶ 2. I am informed that he was formally terminated on December 22, 2011.

21. Urumov was recruited to OSL from Knight Capital Europe Group ("Knight") in October 2010, along with four members of Knight's fixed income team: Alessandro Gherzi ("Gherzi"), Nipun Ramaiya, Alicia Mujagic, and Jamil Mufti (collectively, the "Knight Traders"). *See* Second Affidavit of Howard Snell, dated December 7, 2011, ¶¶ 16-17, relevant excerpts of which are annexed collectively hereto as "Exhibit 6."

22. Urumov came highly recommended to OSL's former Chief Executive Officer Roman Lokhov ("Lokhov") by two Otkritie employees: Ruslan Pinaev, an Otkritie trader in London and Moscow, and Sergey Kondratyuk, Otkritie's Head Fixed Income Trader in Moscow. *See* Second Witness Statement of Roman Lokhov, dated November 18, 2011, ¶¶ 40-41, relevant excerpts of which are annexed collectively hereto as "Exhibit 7."

23. When Urumov joined OSL in February 2011, he was named manager of OSL's Fixed Income Group, making him a leader of OSL's agency trading business. *Id.* ¶¶ 35-40.

24. **The Signing-On Fee:** In November of 2010, following a series of negotiations between Urumov and Lokhov regarding signing-on fees, OSL agreed to pay a multi-million dollar signing-on fee for Urumov and the other Knight Traders. *See* Ex. 6 ¶ 17. The signing-on fee payment was intended to be distributed in equal proportion among the five Knight Traders as part of their compensation package. *See id.* ¶ 18.

25. Urumov misled OSL and distributed to his team members only a portion of the signing-on fee, keeping the balance for himself and two of his apparent cohorts, Kondratyuk and Pinaev. *See* Ex. 6 ¶ 19; Second Witness Statement of Howard Snell, ¶ 34, relevant excerpts of which are annexed collectively hereto as "Exhibit 8."

26. Applicants believe Urumov and his co-conspirators could have been planning this signing bonus fraud, and the Warrants Fraud which is the focus of this Application, for several months.

27. **The First Argentinean Warrants Transaction:** After gaining employment at OSL, Urumov, working with Pinaev and others, orchestrated a sophisticated fraud on the Otkritie Entities, which resulted in an approximately $160 million loss. *See* Ex. 6 ¶¶ 6, 37-39. Before engineering this loss, Urumov, Pinaev and their co-conspirators engineered a small profitable transaction to ensure they could pull off the larger and more costly transaction. *Id.* ¶¶ 42-43.

28. On February 25, 2011, OSL entered into a trade involving certain GDP-linked government subscription bonds offered by the Republic of Argentina (hereinafter, the "Argentinean Warrants" and the "First Argentinean Warrants Transaction"). *See id.* ¶ 42; Ex. 8 ¶ 52; *see also* Argentinean Warrant Offering Invitation, relevant excerpts of which are annexed collectively hereto as "Exhibit 9." The Argentinean Warrants were first issued to the market between April 30, 2010 and June 7, 2010 as part of an offering coordinated by Deutsche, Barclays, and Citibank. *See id.* The Warrants that OSL traded in were Argentinean Peso-denominated and had the ISIN number ARARGE03E147. *See* Ex. 6 ¶ 42; Ex. 8 ¶ 52. But the Argentinean Warrants are also routinely traded in Euros and U.S. Dollars and have ISIN numbers XS0209139244, ARARGE03E154, or XS0501197262. *See* Ex. 9 at 13.

29. In the First Argentinean Warrants Transaction, the conspirators caused OSL to purchase 100 million Argentinean Warrants from Bulgarian-based Adamant Capital Partners AD ("Adamant") for $13.02 million. *See* Ex. 6 ¶¶ 43-44; Ex. 8 ¶¶ 53, 55.

30. OSL then re-sold the Argentinean Warrants a week later, on March 2, 2011, to Snoras, a Lithuanian financial institution controlled by Vladimir Antonov and recently taken over by the Lithuanian Central Bank. *See* Ex. 6 ¶ 41. *See* Bloomberg Article on Vladimir Antonov, dated December 15, 2011, a copy of which is annexed hereto as "Exhibit 10."

31. The sale was intermediated by JSC Norvik Banka ("Norvik"), a Latvian bank, at a price of $15.47 million. Ex. 6 ¶ 43; Ex. 8 ¶ 53. OSL earned a profit of approximately $2.45 million on the trade. Ex. 6 ¶ 43; Ex. 8 ¶ 53.

32. At or around the time the Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos (ARS) per 100. *See* Ex. 6 ¶ 38. The conversion rate between US dollars (USD) and Argentinean pesos (ARS) was about 1:4. *Id.*

33. In the trades that were processed—with OSL first on the buy-side and a week later on the sell-side—the exchange rate between U.S. dollars and Argentinean pesos was expressed as 1:1 in OSL's Bloomberg trading system. Ex. 6 ¶ 46; Ex. 8 ¶¶ 56, 59. Upon information and belief, Urumov and/or Pinaev directed, or caused to be directed, Yevgueni Jemai to enter this incorrect exchange rate.

34. This first trade in Argentinean Warrants was a dry run for the subsequent fraud—specifically, a way for the co-conspirators to test an exchange rate tampering scheme and to create the perception of a robust market for the Argentinean security. *See* Ex. 6 ¶ 42.

35. Disclosures made by BGC Brokers in a special discovery proceeding supporting the U.K. Action indicate that BGC Brokers provided co-conspirators with the 100 million Warrants that were ultimately sold to OSL as part of the First Argentinean Warrants Transaction. *See* BGC Schedule, at Trade 4, dated September 7, 2012, a copy of which is attached hereto as "Exhibit 11." Applicants obtained this discovery pursuant to an order issued by Justice Teare in *Otkritie Securities Limited et al. v. BGC Brokers, L.P.*, Claim Number 2012-462 (the "BGC Proceeding"). *See* Order of Justice Teare, dated July 13, 2012, a copy of which is attached hereto as "Exhibit 12"; Letter from Berwin Leighton Paisner LLP to Jennifer Jenkins, dated September 7, 2012, a copy of which is attached hereto as "Exhibit 13."

36. BGC Brokers claims it acquired the 100 million Warrants sold to OSL in the First Argentinean Warrants Transaction from BGC Financial. *See* Ex. 11 at Trade 5.

37. Neither BGC Brokers nor BGC Financial is a party to the U.K. Action.

38. We are informed that, despite numerous requests by Applicants' U.K. counsel, BGC Brokers has declined to make any further disclosures concerning BGC Financial's involvement in the First Argentinean Warrants Transaction on a voluntary basis. We are also

8

informed that, as a U.S. entity, BGC Financial cannot be compelled to provide information or disclosure by the courts in London.

39. **Second Argentinean Warrants Transaction**: On March 9, 2011, Urumov, Pinaev and their co-conspirators caused OSL to acquire 1.65 billion of the same Argentinean Warrants, *i.e.*, having ISIN ARARGE03E147 (hereinafter, the "Second Argentinean Warrants Transaction"). *See* Ex. 6 ¶ 37; Ex. 8 ¶ 47.

40. OSL paid approximately $213 million for the Warrants at a notional price of $12.9375 per 100. *See* Ex. 6 ¶ 37; Ex. 8 ¶ 47.

41. OSL purchased the Warrants from Adamant Capital Partners LP ("Adamant"), whom Applicants have confirmed was acting as a switch counterparty (*i.e.*, intermediary) between OSL and Snoras. *See* Ex. 6 ¶ 41; Ex. 8 ¶ 51; Adamant Capital Partners Securities Trade Confirmation, dated March 9, 2011, a copy of which is attached hereto as "Exhibit 14"; Bloomberg Trade Tickets for Trades in Argentinean Warrants between Adamant and Snoras, dated March 10, 2011, copies of which are attached hereto as "Exhibit 15."

42. At the time these Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos per 100. *See* Ex. 6 ¶ 37. The conversion rate between US dollars (USD) and Argentinean pesos (ARS) was about 1:4. *Id.* ¶ 38.

43. When the Second Argentinean Warrants Transaction was processed, the exchange rate between US dollars and Argentinean pesos in OSL's Bloomberg trading system was, once again, expressed as 1:1, causing OSL to pay some $213 million for Warrants worth about $53 million, producing a loss of approximately $160 million. *See* Ex. 6 ¶¶ 38-39. We are advised that this $160 million loss figure is subject to revision based on evolving information concerning, *inter alia*, the precise ARS:USD exchange rate and market price for the Warrants at the time.


44. Senior management agreed to the transaction because Urumov assured them that it was riskless. *See* Ex. 6 ¶ 40; Ex. 8 ¶ 50. Urumov represented he had negotiated a forward sale of the Argentinean Warrants to a third party, Threadneedle, for approximately $228 million, with a maturity of six months, and that OSL would merely be acting as a temporary warehouse and provider of financing for the deal. *See* Ex. 6 ¶ 40; Ex. 8 ¶ 50.

45. Gersamia, then a portfolio manager at Threadneedle, played an essential part in the ruse, holding Threadneedle out as a willing counterparty. *See* Ex. 6 ¶ 40; First Affidavit of Neil Patrick Dooley, dated February 29, 2012, at ¶ 18, excerpts of which are annexed hereto as "Exhibit 16." Gersamia is a Georgian national, a business contact of Urumov, and close friend of Gherzi. *See* Ex. 16 ¶ 18.

46. The Threadneedle forward sale was never consummated and Threadneedle has insisted it never agreed to such a trade. Threadneedle later dismissed Gersamia for his role in the fraud. *See* Ex. 6 ¶¶ 40, 54; Ex. 8 ¶ 50.

47. Applicants believe Urumov and/or Pinaev again instructed Jemai to input the trade into OSL's Bloomberg trading system at the exchange rate of 1:1. *See* Ex. 6 ¶¶ 38-39. Urumov, however, claims to know "nothing whatsoever of the strategy behind the purchase [of the warrants] or whether Otkritie intended to warehouse the warrants." *See* Second Witness Statement of Georgy Urumov, dated November 4, 2011, at ¶ 106, relevant excerpts of which are annexed hereto as "Exhibit 17." Urumov insists he was absent having his thyroid removed during much of March 2011 when the Second Argentinean Warrants Transaction was being arranged. *Id.*

48. Recent disclosures made in the BGC Proceeding suggest that at least 250 million of the Warrants sold to OSL as part of the Warrants Fraud were acquired for Urumov, Pinaev and their cohorts by BGC Brokers. *See* Ex. 11 at Trades 7, 8.

Doc. # DC-8105739 v.3

49. David McCann, one of BGC Brokers' employees, is believed to have been the co-conspirators' main contact at BGC Brokers. *See* Bloomberg Communications between David McCann and Ruslan Pinaev, from February to July 2011, annexed hereto as "Exhibit 18."

50. On February 18, 2011, Pinaev reached out to McCann about his ability to do big trades in Argentinean Warrants. *See id.* at 226 ("can u look into ur super system what are the usual sizes that go through in argy wrn pesos"). McCann responded that, while he couldn't easily trade 500 million Warrants "in 1 clip," he could do so "in a week." *See id.*

51. On February 25, 2011, apparently satisfied that McCann could get him the volume of Warrants he needed, Pinaev told McCann to arrange for Snoras, rather than OSL, to be the counterparty to the transaction. *See id.* at 229 ("u can only settle with snoras that's it no other way"). Pinaev noted that "dima" would settle the trade on Snoras' side. *Id.* at 228. Upon information and belief, "Dima" refers to Dmitry Posokhov, who we understand based on disclosures in the U.K. Action to be a current or former employee of Snoras or one or more of its affiliate banks, *e.g.,* Finasta Bank AB, JSC Investbank, or Konversbank PJSC.

52. BGC Brokers had a direct line of trading with OSL, but no such relationship with Snoras. *See id.* at 229.

53. To accommodate Pinaev's insistence that Snoras be the named counterparty, BGC Brokers planned to use Commerzbank as a "switch" or intermediary. *Id.* Applicants believe that if this has been a *bona fide* transaction, Pinaev would have instructed McCann to sell directly to OSL.

54. On February 28, 2011, McCann messaged Pinaev to say that there was a problem with the switch, to which Pinaev replied, "do u want to make money?" *Id.* at 231. McCann answered, "yes lots of it…." *Id.*

55. On March 3, 2011, McCann told Pinaev, "I think i will be able to get my risk department to agree to give snoras a 50mil limit (500 peso), for these trades." *Id.* at 233.

56. A couple weeks later, in a communication dated March 16, 2011, just days after the Second Argentinean Warrants Transaction was executed, McCann told Pinaev that the transactions went through without difficulty: "the good news is the wrnt p$ trades settled perfectly, no problems at all." *Id.* at 234.

57. **U.K. Civil Proceedings:** On October 5, 2011, after uncovering misappropriations by Urumov relating to the signing-on fee (*see* Ex. 6 ¶ 7), Otkritie applied for and obtained without notice to Urumov an *ex parte* freezing order and proprietary injunction against Urumov. *See* October 5 Freezing Order issued by HHJ Judge Mackie QC, a copy is annexed hereto as "Exhibit 19." The freezing order precluded Urumov from in any way disposing of, dealing with, or diminishing the value of the signing-on fee of $23 million paid by Otkritie to Urumov on November 22, 2010. *Id.*

58. On October 21, 2011, after further review of Otkritie's evidence and Urumov's defenses, Justice Burton confirmed and extended the October 5, 2011 asset freeze until further order of the court. *See* Ex. 6 ¶ 9; October 21 Freezing Order issued by Justice Burton, a copy is annexed hereto as "Exhibit 20."

59. On December 7, 2011, the previous freezing orders were expanded by $160 million to incorporate suspected proceeds of the Warrants Fraud. *See* December 7 Freezing Order issued by Justice Burton, a copy is annexed hereto as "Exhibit 21."

60. On December 8, 2011, Applicants filed an amended "Claim Form," similar to a rudimentary complaint, refining their claims in the U.K. Action. A copy of the December 8, 2011 Claim Form is annexed hereto as "Exhibit 22."

61. We are advised by U.K. counsel that on March 1, 2012 the Applicants applied for the following orders later granted by Justice Flaux: (i) an order to join ten (10) additional defendants to the Action including, among others, Pinaev, Kondratyuk, and Yevgueni Jemai; (ii) an order to freeze the assets of the new defendants in various amounts between $2.5 and $160 million; and (iii) an order for judgment against one of the defendants, Dunant International SA ("Dunant") for $34 million. Copies of these orders are annexed hereto as "Exhibits 23 to 25."

62. On March 16, 2012, Justice Teare extended, until further order of the U.K. court or trial, the freezing order made by Justice Flaux.

63. In late March 2012, the Applicants became the registered owners of a property in England previously owned by Dunant and purchased for $32 million in April 2011 using monies misappropriated from the Applicants.

64. On May 10, 2012, the Applicants applied *ex parte* to add four additional defendants to the U.K. Action—the sisters of two previously named defendants and their offshore companies. Applicants also sought a freezing order covering the assets of the four additional defendants. Applicants' requests were granted by order of Justice Gloster dated May 10, 2012. *See* Order of Justice Gloster, dated May 10, 2012, a copy is annexed hereto as "Exhibit 26." Ancillary to the application in the U.K. Action, Applicants have also taken steps to freeze a property in Spain acquired by one of the new U.K. defendants for approximately $6 million and to proceed against Pinaev in Israel. We are advised that these applications were granted as well.

65. On May 25, 2012, Justice Hamblen extended Justice Gloster's freezing order.

66. On June 14, 2012, the Applicants applied *ex parte* to add one additional defendant to the U.K. Action, the wife of Pinaev. Applicants also sought a freezing order covering her assets and permission to initiate proceedings against her in Israel. Applicants' requests were

13

granted by order of Justice Cooke dated June 14, 2012. See Order of Justice Cooke, dated June 14, 2012, a copy is annexed hereto as "Exhibit 27."

67. On June 29, 2012, Justice Smith extended, until further order of the U.K. Court or trial, the freezing Order entered by Justice Cooke.

68. On July 13, 2012, Applicants applied for an order compelling discovery from BGC Brokers. We are informed that the application was made pursuant to the U.K. Court's power to order disclosure from a third party who has become involved in wrongdoing, whether inadvertently or not, where that third party is unlikely to be a party to the substantive proceedings. Applicants' order was granted by Justice Teare, and BGC Brokers was ordered to produce, by no later than September 7, 2012, *inter alia*, a schedule of all trades in the Argentinean Warrants from November 2010 to August 2011. See Ex. 12 at Schedule 1, 2.

69. On July 16, 2012, Applicants applied for entry of a judgment of default against FO Firmly Oceans Corp., Natalia Demakova and Qast International S.A. Justice Teare entered default judgment against the three defendants for $36.8, $19.9 and $16.9 million, respectively. A copy of these orders is annexed hereto as "Exhibit 28."

70. On July 18, 2012, there was a case management hearing before Justice Walker. The trial in the U.K. Action was set for June 2013.

71. On September 7, 2012, BGC Brokers provided limited discovery relating to its trading in Argentinean Warrants during the period from November 1, 2010 through August 31, 2011. See Ex. 11; Ex. 13. BGC Brokers acknowledged that the trades had been "procured by [Otkritie] (through Ruslan Pinaev)" but denied that OSL was BGC Brokers' client for the trades. *See* Letter from Bern Leighton Paisner LLP to Jennifer Jenkins, dated September 25, 2012, a copy of which is attached hereto as "Exhibit 34."

72.   We are informed that BGC Brokers' September 7 disclosures were deficient in a number of respects. For example, we understand that BGC Brokers has declined to provide substantive information concerning the role of BGC Financial in the Warrants transactions, even though it has identified BGC Financial as the source of hundreds of millions of Warrants, and even though it was ordered to provide *"Bloomberg messages, emails, letters and documents including trade tickets and pricing research"* relating to each of its trades in the Argentinean Warrants. *See* Ex. 12 at Schedule 1 (emphasis added); Letter from Memery Crystal LLP to Andrew Tuson, dated October 26, 2012, a copy of which is attached hereto as "Exhibit 29"; Letter from Berwin Leighton Paisner LLP to Memery Crystal LLP, dated November 6, 2012, a copy of which is attached hereto as "Exhibit 30."

73.   On September 27, 2012, Applicants applied for entry of a judgment of default against Kondratyuk. Justice Field entered default judgment against the defendant for $183 million. A copy of this order is annexed hereto as "Exhibit 31."

74.   On November 9, 2012, Applicants applied for default judgment against four defendants connected to the Jemai family—Yevgueni Jemai, Irina Jemai, Jecot, and Vantax Limited ("Vantax"). Default judgment was entered against Vantax, but denied or deferred as to the remaining three because, at the last minute, they entered appearances in the case.

75.   U.K. counsel has also advised that defenses have now been served by a number of defendants in the U.K. Action, including Urumov and Pinaev. Urumov and Pinaev have denied any wrongdoing. In particular, they assert the instructions for Warrants Fraud trades came from Applicants' senior management; that the moneys received by Gemini were part of a commercial arrangement with Gemini; and that all dealings with Gemini were handled by Kondratyuk.

76.   We are also advised by U.K. counsel that they cannot issue demands against the New York-based Discovery Respondents because they are not subject to the U.K. court's

15

jurisdiction. As a result, any efforts to obtain discovery would need to be processed pursuant to the Hague Convention; would take many months, providing Urumov and his co-conspirators more time to dissipate the diverted funds; and would be unlikely to provide the same level of response as this Application.

77. In addition, U.K. counsel advises us that there would be no restrictions under U.K. law on Applicants' use of any discovery obtained through this Application in connection with any judicial proceedings relating to the U.K. Action.

78. **Other Proceedings:** Both the signing-on fee misappropriation described above and the Argentinean Warrants Fraud have been reported to the U.K. Financial Services Authority and the City of London Police. *See* Ex. 6 ¶ 8. Criminal investigations are ongoing in England, and have the Otkritie Entities' full cooperation. Urumov, his wife Yulia Balk, Gersamia and Gherzi have been arrested by City of London Police and released on bail after questioning.

79. As part of its ongoing investigation into the Warrants Fraud, Otkritie has also directed a criminal complaint against the co-conspirators to Swiss authorities. *See id.* ¶ 10.

80. On November 21, 2011, one of Urumov's suspected co-conspirators, Kondratyuk, was arrested in Zurich. *See id.* ¶ 14.

81. On November 25, 2011, Kondratyuk appeared before a Swiss magistrate and was remanded into custody, where he remains, on suspicion of fraud and money laundering. *See id.* ¶ 64.

82. We are advised that, in April 2012, the Geneva Public Prosecutor indicted Yevgueni Jemai's mother, Olessia Jemai, on charges of money laundering, involving proceeds of the frauds at issue in the U.K. Action.

83. In addition, we are advised that the Geneva Public Prosecutor has frozen nearly $50 million in cash assets and property assets worth in excess of $17 million. *See id.* ¶ 15.

Doc. # DC-8105739 v.3

84. Applicants have commenced related proceedings in jurisdictions such as Hong Kong, Gibraltar, Luxembourg, Israel, and the Bahamas. *See* Third Witness Statement of Neil Dooley, dated December 14, 2011, at ¶¶ 13-21, excerpts of which are annexed hereto as "Exhibit 32."

85. **Notice:** Contemporaneous with the filing of this Seventh Application, Applicants are providing copies of these papers to the General Counsel's office of BGC Financial.

86. **Dissipation of Misappropriated Funds and Dilatory Tactics:** Applicants do not believe that Urumov, Kondratyuk, Jemai, or their cohorts need to be provided with notice of these proceedings because they have expressly disavowed any knowledge of, or involvement in, the Second Argentinean Warrants Transaction to which this Application is addressed. *See* Ex. 7 ¶ 106.

87. Furthermore, Applicants oppose giving notice of these proceedings to Urumov, Kondratyuk, Jemai, or their co-conspirators because Applicants believe, based upon recent experience, that they may seek to interfere with these proceedings and attempt to further conceal misappropriated funds. *See, e.g.,* Ex. 6 ¶¶ 113-15.

88. In the U.K. Action, when ordered by the court to disclose the full extent of his assets, Urumov failed to identify several companies he owned or otherwise controlled, including Dunant, which was later discovered to have transferred funds in breach of the U.K. court's October 5 Freezing Order. *Id.* ¶¶ 110-11. Moreover, Urumov, failed to disclose that he and his wife had acquired a property in the U.K., in Dunant's name, for $32 million. *See id.* ¶¶ 105-06.

89. Furthermore, on September 27, 2012, Justice Field ordered that Pinaev and his wife must submit to cross-examination regarding their assets because he was not satisfied that they had complied with their asset disclosure obligations. *See* Order of Justice Field, dated September 27, 2012, a copy of which is attached hereto at "Exhibit 33."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
November 19, 2012

_____
Michael C. Miller

Doc. # DC-8105739 v.3