UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

OTKRITIE INTERNATIONAL
INVESTMENT MANAGEMENT LIMITED,
a company incorporated in the British Virgin
Islands,

OTKRITIE SECURITIES LIMITED,
a company incorporated in England and Wales,
and

OTKRITIE FINANCIAL CORPORATION JSC,
a company incorporated in the Russian Federation,

To Issue Subpoenas for the Production of
Documents and Testimony for Use in a Foreign
Proceeding.

**12 MISC 00382**

Civil Action No. 12-MC-



## MEMORANDUM OF LAW IN SUPPORT OF SEVENTH APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND TESTIMONY FOR USE IN A FOREIGN PROCEEDING

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: 212-506-3900
Fax: 212-506-3950
*Attorneys for Applicants*

## Table of Contents

| | Page |
|---|---|
| Table of Authorities | iii, iv |
| INTRODUCTION | 1 |
| FACTUAL BACKGROUND | 4 |
|     The Okritie Entities | 4 |
|     Georgy Urumov | 5 |
|     The Signing-On Fee | 5 |
|     Argentinean Warrants Transactions and Fraud | 5 |
|     The First Argentinean Warrants Transaction | 6 |
|     The Second Argentinean Warrants Transaction – The Warrants Fraud | 7 |
|     UK Civil Proceedings | 10 |
|     Other Proceedings | 14 |
| SCOPE OF DISCOVERY REQUESTS | 15 |
| ARGUMENT | 15 |
|   I. THE CONTEMPLATED DISCOVERY MEETS  ALL THREE MANDATORY REQUIREMENTS OF § 1782 | 15 |
|     A. The Entities from whom Discovery is Sought are "Found in" New York County and are therefore within the Judicial District | 16 |
|     B. The Requested Discovery is "For Use in a Foreign Proceeding" | 16 |
|     C. Entities are "Interested Persons" Within the Meaning of Section 1782 Because They are Litigants in the U.K. Action | 17 |
|   II. DISCRETIONARY FACTORS WEIGH IN FAVOR OF GRANTING DISCOVERY | 17 |

i

A.   Because the Persons and Entities from whom Discovery is Sought
      are not Participants in the U.K. Action, Judicial Assistance is Warranted............18

B.   The U.K. Action Where the Requested Discovery Would be Used
      is an Appropriate Subject of Judicial Assistance....................................................19

C.   This Application is Brought in Good Faith............................................................20

D.   Applicants' Discovery Requests are Narrowly Tailored ......................................21

CONCLUSION ...............................................................................................................22

Doc. # DC-8107352 v.2

## Table of Authorities

**Cases**

*Esses v. Hanania*, 101 F.3d 873 (2d Cir. 1996)..................................................................17

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995) .........................................18

*Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998) .........................................16

*In re Application of Bank of Cyprus PCL*, No. 10 Misc. 23, 2011 U.S. Dist. LEXIS 6082
   (S.D.N.Y. January 21, 2011) .........................................................................................17

*In re Application of Blue Oil Trading Ltd.*, 2009 WL 3353293 (W.D.N.C. Oct. 15, 2009) ...20

*In re Application of Guy*, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004) ...............................20

*In re Application to Take Discovery from Dominique Levy*, 249 F.R.D. 96
   (S.D.N.Y. 2008) ......................................................................................................16, 17

*In re Godfrey*, 526 F. Supp. 2d 417 (S.D.N.Y. 2007) ..........................................................16

*In re Gushlak*, 2011 WL 3651268 (E.D.N.Y. Aug. 17, 2011) ...............................................21

*In re Malev Hungarian Airlines*, 964 F.2d 97 (2d Cir. 1992) ...............................................18

*In re Metallgesellschaft AG*, 121 F.3d 77 (2d Cir. 1997)................................................18, 21

*In re Microsoft Corp.*, 428 F. Supp. 2d 188 (S.D.N.Y. 2006)...............................................19

*In re Petition of Brierley*, 145 B.R. 151 (S.D.N.Y. 1992)....................................................19

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247, 124 S. Ct. 2466,
   159 L.Ed.2d 355 (2004).........................................................................................passim

*Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807 (S.D.N.Y. 1992)........................20

*Minatec Fin. S.A.R.L. v. SI Group, Inc.*, 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) .......21

*Otkritie Int'l Invest. Mgmt. Ltd. et al. v. Urumov et al.*, 2011 Folio 1182 ...............................1

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79 (2d Cir. 2004) .........................18

*South Carolina Ins. Co. v. Assuranti Maatschappij "De Zeven Provincien" N.V.* [1987]
   1 A.C. 24.....................................................................................................................20

Doc. # DC-8107352 v.2

**Statutes**

28 U.S.C. § 1782 ...........................................................................................................*passim*

iv

Doc. # DC-8107352 v.2

Otkritie International Investment Management Limited ("Otkritie Management"),

Otkritie Securities Limited ("OSL"), and Otkritie Financial Corporation JSC ("Otkritie

Financial") (collectively, "Otkritie Entities" or "Applicants") respectfully submit this

memorandum of law and accompanying Declaration of Michael C. Miller with exhibits ("Miller

Decl."), in support of their seventh application pursuant to 28 U.S.C. § 1782 ("Seventh

Application"), for an order authorizing the Applicants to obtain discovery from BGC Financial

Group, Inc. (hereinafter, "BGC Financial" or "Discovery Respondent"), for use in a civil fraud

action pending in the United Kingdom's High Court of Justice, Queen's Bench Division,

captioned *Otkritie International Investment Management Limited et al. v. Urumov et al.*, 2011

Folio 1182 ("the U.K. Action").

## INTRODUCTION

This Application follows the Otkritie Entities' prior Application for an Order under 28

U.S.C. § 1782 to Issue Subpoenas for the Production of Documents for Use in a Foreign

Proceeding ("Original Application"); Second Application for an Order under 28 U.S.C. § 1782

("Second Application"); Third Application for an Order under 28 U.S.C. § 1782 ("Third

Application"); Fourth Application for an Order under 28 U.S.C. § 1782 ("Fourth Application");

Fifth Application for an Order under 28. U.S.C. § 1782 ("Fifth Application"), and Sixth

Application for an Order under 28 U.S.C. § 1782 ("Sixth Application"), filed on January 4,

February 21, April 13, May 24, August 6, and November 13, 2012, respectively. *See In re*

*Application of Otkritie Int'l Invest. Mgmt. Ltd., et al to Issue Subpoenas for the Production of*

*Documents for Use in a Foreign Proceeding,* at DE 1-3, 14-16, No. 12-MC-1 (S.D.N.Y. Jan. 4,

2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-118 (S.D.N.Y. April 13, 2012); *In re*

1

*Application of Otkritie*, at DE 1, No. 12-MC-177 (S.D.N.Y. May 24, 2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-262 (S.D.N.Y. Aug. 6, 2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-374 (S.D.N.Y. Nov. 13, 2012).

As set forth in prior filings, Applicants commenced the U.K. Action to recoup more than $183 million in funds misappropriated in a series of frauds orchestrated by one of OSL's former executives, Georgy Urumov ("Urumov"). In that Action, Applicants allege that in March 2011 Urumov and co-conspirators, through fraud and deceit, caused OSL to overpay Bulgarian securities broker Adamant Capital Partners AD ("Adamant") by approximately $160 million for some 1.65 billion Argentinean GDP warrants ("Warrants" or "Argentinean Warrants"), diverting the sale proceeds to themselves (hereinafter, the "Warrants Fraud").

All six of the Applicants' prior 1782 applications were granted. The resulting subpoenas have yielded thousands of pages of documents with information directly pertaining to the U.K. Action. A color-coded chart attached as Exhibit 3 to the accompanying Miller Declaration summarizes key achievements of Otkritie's previous discovery applications.

Very briefly, disclosures resulting from the First and Second Applications, coded in green, identified and confirmed the movement of $150 million in Warrants Fraud proceeds through the accounts of Gemini Investment Fund Limited ("Gemini") at A.B. Bank Snoras ("Snoras"), a now insolvent Lithuanian bank, and Latvijas Krajbanka ("Krajbanka"), also an insolvent Latvian bank. The Third Application traced the dissipation by Vladimir Gersamia ("Gersamia") of $10.1 million in Warrants Fraud proceeds through various entities including Belux Company (Hong Kong) Limited ("Belux"), Templewood Capital Limited, Jaspen Capital Partners Limited ("Jaspen"), KD Shipping Co. Limited Inc., and Tremlett International Ltd. The Fourth Application, coded in red, traced the dissipation of Warrant Fraud proceeds from

2

accounts held by a Ukrainian company, Donetsk Steel, Andriy Supranonok, the CEO of Jaspen and a suspected beneficiary of the Warrants Fraud, a Tajikistan company called Silver LLC ("Silver"). The Fourth Application helped to reveal, among other things, that Silver is partly-owned by co-conspirator Yevgueni Jemai's ("Jemai") father. Discovery relating to the Fifth Application, coded in purple, is ongoing, but has already yielded valuable information concerning the co-conspirators' efforts to use a New York-based brokerage to intermediate a sale of the Warrants from Otkritie to a third party, Threadneedle Asset Management ("Threadneedle"). Applicants' Sixth Application was just granted on November 15, 2012. It concerns the dissipation of proceeds of the Warrants Fraud via Gemini and affiliated entities and persons. Discovery pursuant to that Application has only just begun.

This Seventh Application is based on new information concerning the co-conspirators' sourcing of the Argentinean GDP Warrants in the lead up to the Warrants Fraud. Through a special third-party U.K. discovery proceeding commenced against U.K.-based BGC Brokers, L.P. (hereinafter, "BGC Brokers" and the "BGC Proceeding") earlier this year, Applicants have learned that BGC Financial Group, Inc., or possibly another New York-based BGC subsidiary doing business under a similar name, may have unwittingly provided the co-conspirators with at least 250 million of the Warrants used in the Warrants Fraud.

With this Application, Applicants seek to obtain from BGC Financial, among other things, a schedule of all trades in the Argentinean Warrants to which it was a party in the period before and during the Warrants Fraud, from August 2010 to August 2011, communications relating such trading, information concerning BGC Financial's sourcing of the Argentinean Warrants and testimony concerning these issues.

3

As set forth below, this Application for discovery in aid of the U.K. Action is well within the statutory requirements of Section 1782 and prevailing Second Circuit law. Discovery is further supported by the U.S. Supreme Court's decision in the leading case of *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 124 S. Ct. 2466, 159 L.Ed.2d 355 (2004). The requested discovery promises to advance critical objectives, including, at a minimum, further confirming the liability of Urumov and his co-conspirators and perhaps revealing still unknown aiders and abettors.

The Discovery Respondent is within the Court's subpoena power, and U.K. courts routinely accept the assistance of U.S. courts. The discovery requests are narrowly tailored to the goal of tracking the diverted funds and are not unduly burdensome or intrusive. For all these reasons, Applicants respectfully submit that their request for discovery should be granted.

## FACTUAL BACKGROUND

### The Otkritie Entities

Otkritie Financial is the parent of an international banking and finance group centered in Russia. *See* Miller Decl. Ex. 5 ¶ 1.1. In about 15 years, Otkritie Financial has become one of the leading banking institutions in Russia with over 240 branches. Otkritie Management is a subsidiary of Otkritie Financial, incorporated in the British Virgin Islands. *Id.* ¶ 1.2. Otkritie Management is as an investment holding company and provider of finance to the Otkritie group of companies. *Id.* OSL is a London-based subsidiary of Otkritie Financial with expertise in securities brokerage, safekeeping and management of portfolios, financing and loans on securities, the issuing and cancellation of deposit securities, and the currency market. *Id.* ¶ 1.3.

4

**Georgy Urumov**

From February 2011 until he was suspended on September 8, 2011, Urumov was a trader in fixed income securities in OSL's London office. *Id.* ¶ 2. Urumov was formally terminated by OSL on December 22, 2011. *See* Miller Decl. ¶ 20.

In October 2010, Urumov was recruited to OSL from Knight Capital Europe Group ("Knight"), along with four other Knight traders. *Id.* Ex. 6 ¶¶ 16-17. Urumov was highly recommended to OSL's former Chief Executive Officer Roman Lokhov ("Lokhov"), by two Otkritie employees who would later betray the company and assist in Urumov's fraud: Ruslan Pinaev, then an Otkritie trader in London and Moscow, and Sergey Kondratyuk ("Kondratyuk"), Otkritie's former Head Fixed Income Trader in Moscow. *Id.* Ex. 7 ¶¶ 40-41. When Urumov and his team joined OSL in February 2011, Urumov was named the manager of OSL's Fixed Income Group, making him a leader of OSL's agency trading business. *Id.* Ex. 7 ¶¶ 35-40.

**The Signing-On Fee**

In November 2010, following negotiations between Urumov and Lokhov regarding signing-on fees, OSL agreed to pay a multi-million dollar signing-on fee for Urumov and the other Knight traders. *See id.* Ex. 6 ¶ 17. The signing-on fee payment was intended to be distributed in equal proportion among the five Knight traders as part of their compensation package. *See id.* Ex. 6 ¶ 18. However, Urumov misled OSL and distributed to his team members only a portion of the signing-on fee, keeping the balance for himself and two of his apparent cohorts, Kondratyuk and Pinaev. *See id.* Ex. 6 ¶ 19; Ex. 8 ¶ 34.

**Argentinean Warrants Transactions and Fraud**

After starting at OSL, Urumov, working with Pinaev and others, orchestrated a fraud, which resulted in an approximately $160 million loss. *See id.* Ex. 6 ¶¶ 6, 37-39. Before

engineering this loss, Urumov, Pinaev, and their co-conspirators caused OSL to enter into a small profitable transaction, to test OSL's systems, to ensure they could pull off the far larger and more costly transaction. *See id.* Ex. 6 ¶¶ 42-43.

**The First Argentinean Warrants Transaction**

The First Argentinean Warrants Transaction occurred on February 25, 2011 when OSL acquired certain Argentinean GDP warrants having the international identification number ISIN ARARGE03E147. *See id.* Ex. 6 ¶ 42; Ex. 8 ¶ 52; Ex. 9 (indicating that the security was first issued between April 30, 2010 and June 7, 2010 as part of an offering coordinated by a number of major New York-based banks).[1] Specifically, Urumov, Pinaev, and their co-conspirators caused OSL to purchase 100 million Argentinean Warrants from Adamant, a Bulgarian brokerage firm, for $13 million. *See id.* Ex. 6 ¶¶ 43-44; Ex. 8 ¶¶ 53, 55.

OSL re-sold the securities a week later, on March 2, 2011, to A.B. Bank Snoras ("Snoras"), a Lithuanian financial institution controlled by Vladimir Antonov and recently taken over by the Lithuanian Central Bank. *See id.* Ex. 6 ¶ 41; Ex. 10. The sale was intermediated by JSC Norvik Banka for $15.47 million. *See id.* Ex. 6 ¶ 43; Ex. 8 ¶ 53. OSL earned a profit of approximately $2.45 million on the trade. *See id.* Ex. 6 ¶ 43; Ex. 8 ¶ 53.

At or around the time the Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean Pesos (ARS) per 100. *See id.* Ex. 6 ¶ 38. The conversion rate between US dollars (USD) and Argentinean Pesos (ARS) was about 1:4. *Id.* However, in the trade that was actually processed, the exchange rate between U.S. Dollars and Argentinean Pesos was expressed as 1:1 in OSL's Bloomberg trading system. *See id.* Ex. 6 ¶ 46; Ex. 8 ¶¶ 56, 59.

---

[1] The Warrants purchased by OSL in the First Argentinean Warrants Transaction, having the ISIN number ARARGE03E147, were Peso-denominated. However, the security is also routinely traded in Euros and U.S. Dollars and has the following additional ISIN numbers associated with it: XS0209139244, ARARGE03E154, or XS0501197262. *See id.* Ex. 9 at 13.

Upon information and belief, Urumov and/or Pinaev directed, or caused to be directed, Yevgueni Jemai to enter this incorrect exchange rate into the Bloomberg trading system.

OSL executives believe this first trade in Argentinean Warrants was a dry run for the subsequent fraud— *i.e.*, a way to test an exchange rate tampering scheme and to create the perception of a robust market for the Argentinean security. *See id.* Ex. 6 ¶ 42.

Disclosures made by BGC Brokers in a special discovery proceeding supporting the U.K. Action indicate that BGC Brokers provided co-conspirators with the 100 million Warrants that were ultimately sold to OSL as part of the First Argentinean Warrants Transaction. *See id.* Ex. 11. Applicants obtained this discovery pursuant to an order issued by Justice Teare in the BGC Proceeding, captioned *Otkritie Securities Limited et al. v. BGC Brokers, L.P.*, Claim Number 2012-462. *See id.* Ex. 12. BGC Brokers claims that it acquired the 100 million Warrants sold to OSL in connection with the First Argentinean Warrants Transaction from its U.S. affiliate BGC Financial. *See id.* Ex. 11 at Trade 5.

Neither BGC Brokers nor BGC Financial is a party to the U.K. Action. We are informed that, despite numerous requests by Applicants' U.K. counsel, BGC Brokers has declined to make any further voluntary disclosures concerning BGC Financial's involvement in the First Argentinean Warrants Transaction. *See* Miller Decl. ¶ 38. We are also informed that, as a U.S. entity, BGC Financial cannot be compelled to provide discovery by the courts in London. *Id.*

**The Second Argentinean Warrants Transaction – The Warrants Fraud**

On March 9, 2011, Urumov and co-conspirators caused OSL to acquire 1.65 billion of the same Argentinean Warrants. *See id.* Ex. 6 ¶ 37; Ex. 8 ¶ 47. OSL paid approximately $213 million for the securities at a notional price of $12.9375 for 100 bonds. *See id.* Ex. 6 ¶ 37; Ex. 8 ¶ 47.

OSL purchased the 1.65 billion Argentinean Warrants from Adamant, whom Applicants have confirmed was acting as a "switch" or intermediary between OSL and Snoras. *See id.* Ex. 6 ¶ 41; Ex. 8 ¶ 51; Ex. 14; Ex. 15. At the time the Warrants were purchased, they were trading at approximately 13 Argentinean Pesos per 100. *See id.* Ex. 6 ¶ 37. The conversion rate between U.S. Dollars (USD) and Argentinean Pesos (ARS) was about 1:4. *Id.* Ex. 6 ¶ 38. However, in the transaction that was actually proceed, the exchange rate between U.S. Dollars and Argentinean Pesos in OSL's Bloomberg trading system was, once again, expressed as 1:1, causing OSL to pay some $213 million for Warrants worth about $53 million, and producing an estimated loss of $160 million. *See id.* Ex. 6 ¶ 38-39.

Senior management agreed to engage in the transaction because Urumov assured them that the transaction was riskless. *See id.* Ex. 6 ¶ 40; Ex. 8 ¶ 50. Urumov represented that he had negotiated a forward sale of the Argentinean Warrants to a third party, Threadneedle, for approximately $228 million, with a maturity of six months, and that OSL would merely be acting as temporary warehouse and provider of financial in the deal.[2] *See id.* Ex. 6 ¶ 40; Ex. 8 ¶ 50.

Gersamia, then a portfolio manager at Threadneedle, played a key role in the ruse, holding Threadneedle out as a willing counterparty. *See id.* Ex. 6 ¶ 40; Ex. 16 ¶ 18. Gersamia is a Georgian national and business contact of Urumov. *See id.* Ex. 16 ¶ 18.

However, the Threadneedle forward sale was never consummated, and Threadneedle has insisted it never agreed to such a trade. Threadneedle later dismissed Gersamia for his role in the fraud. *See id.* Ex. 6 ¶¶ 40, 54; Ex. 8 ¶ 50.

---

[2] At the time of the purchase, OSL senior management understood that OSL would merely be acting as an agent for a client with respect to the Warrants. *See id.* Ex. 6 ¶ 40; Ex. 8 ¶ 50. After it became clear that the trade was a fraud, the Otkritie Entities were compelled to assume the loss. *See id.* Ex. 7 ¶¶ 81-82.

Applicants believe Urumov and/or Pinaev instructed Jemai to input the trade into OSL's Bloomberg trading system at the exchange rate of 1:1. *See id.* Ex. 6 ¶¶ 38-39. Urumov, however, claims to know "nothing whatsoever of the strategy behind the purchase [of the warrants] or whether Otkritie intended to warehouse the warrants." *See id.* Ex. 17 ¶ 106. According to Urumov, he was absent having his thyroid removed during much of March 2011 when the Second Argentinean Warrants Transaction was being completed. *Id.*

Recent disclosures made in the BGC Proceeding suggest that at least 250 million of the Warrants sold to OSL as part of the Warrants Fraud were acquired for Urumov, Pinaev, and their cohorts by BGC Brokers. *See id.* Ex. 11 at Trades 7, 8. David McCann, one of BGC Brokers' employees, is believed to have been the co-conspirators' main contact at BGC Brokers. *See id.* Ex. 18 (containing numerous email exchanges between McCann and Pinaev).

On February 18, 2011, Pinaev reached out to McCann about his ability to do substantial trades in Argentinean Warrants. *See id.* Ex. 18 at 226 ("can u look into ur super system what are the usual sizes that go through in argy wrn pesos"). McCann responded that, while he couldn't easily trade 500 million Warrants "in 1 clip," he could do so "in a week." *See id.* Ex. 18 at 226.

On February 25, 2011, apparently satisfied that McCann could get him the volume of Warrants he needed, Pinaev told McCann to arrange for Snoras, rather than OSL, to purchase the Warrants. *See id.* Ex. 18 at 229 ("u can only settle with snoras that's it no other way"). Pinaev noted that "dima" would settle the trade on Snoras' side. *See id.* Ex. 18 at 228. Upon information and belief, "Dima" refers to Dmitry Posokhov, a current or former employee of Snoras or one of its affiliates.. *See* Miller Decl. ¶ 51.

BGC Brokers had a direct line of trading with OSL, but no such accommodation with Snoras. *See* Miller Decl. ¶ 52. To accommodate Pinaev's insistence that Snoras be the named

9

counterparty, BGC Brokers planned to use Commerzbank as a "switch" or intermediary. *See id.* Ex. 18 at 229. Applicants believe that if this had been a *bona fide* transaction, Pinaev would have simply instructed McCann to sell directly to OSL. *See* Miller Decl. ¶ 53.

On February 28, 2011, McCann messaged Pinaev to say that there was a problem with the switch, to which Pinaev replied, "do u want to make money?" *Id.* Ex. 18 at 231. McCann replied, "yes lots of it . . . ." *Id.*

On March 3, 2011, McCann told Pinaev, "I think i will be able to get my risk department to agree to give snoras a 50mil limit (500 peso), for these trades." *Id.* Ex. 18 at 233.

A couple weeks later, in a communication dated March 16, 2011, just days after the Second Argentinean Warrants Transaction was executed, McCann told Pinaev that the transactions went through without difficulty: "the good news is the wrnt p$ trades settled perfectly, no problems at all." *Id.* Ex. 18 at 234.

## UK Civil Proceedings

On October 5, 2011, after uncovering misappropriations by Urumov relating to the signing-on fee (*see id.* Ex. 6 ¶ 7), Otkritie applied for and obtained without notice to Urumov an *ex parte* freezing order and proprietary injunction against Urumov. *See id.* Ex. 19. The freezing order precluded Urumov from in any way disposing of, dealing with, or diminishing the value of the signing-on fee paid by Otkritie to Urumov on November 22, 2010. *Id.*

On October 21, 2011, after further review of Otkritie's evidence and Urumov's defenses, Justice Burton confirmed and extended the October 5, 2011 asset freeze until further order of the court. *See id.* Ex. 6 ¶ 9; Ex. 20. On December 7, 2011, the previous freezing orders were expanded to incorporate the suspected proceeds of the Second Argentinean Warrants Transaction, up to $183 million in total. *See id.* Ex. 21. On December 8, 2011, Applicants filed

an amended "Claim Form," similar to a rudimentary complaint, refining their claims in the U.K. Action. *See id.* Ex. 22.

On March 1, 2012 the Applicants applied for the following orders later granted by Justice Flaux: (a) an order to join ten additional defendants to the claim including, among others, Pinaev, Kondratyuk, and Yevgueni Jemai; (b) an order to freeze the assets of the ten additional defendants in various amounts between $2.5 and $160 million; and (c) an order for judgment against one of the defendants, Dunant, in the sum of $34 million.  Copies of these orders are attached to the Miller Declaration as Exhibits 23 to 25.

On March 16, 2012, Justice Teare extended, until further order of the court or trial, the freezing order made by Justice Flaux. *See* Miller Decl. ¶ 62.

In late March 2012, the Applicants became the registered owners of a property in England previously owned by Dunant and purchased for $32 million in April 2011 using monies misappropriated from the Applicants. *See id.* ¶ 63.

On May 10 2012, the Applicants applied *ex parte* to add four additional defendants to the U.K. Action—the sisters of two previously named defendants and their offshore companies. Applicants also sought a freezing order covering the assets of the four additional defendants. Applicants' requests were granted by order of Justice Gloster dated May 10, 2012. *See id.* Ex. 39. Ancillary to the application in the U.K. Action, Applicants have also taken steps to seize a property in Spain acquired by one of the new U.K. defendants for approximately $6 million and to proceed against Pinaev in Israel.  We are advised that these applications were granted as well. *See* Miller Decl. ¶ 64.

On May 25, 2012, Justice Hamblen extended Justice Gloster's freezing order.  *See* Miller Decl. ¶ 65.

Doc. # DC-8107352 v.2

On June 14, 2012, the Applicants applied *ex parte* to add an additional defendant to the U.K. Action, Pinaev's wife.  Applicants also sought a freezing order covering her assets and permission to initiate proceedings against her in Israel.  Applicants' requests were granted by order of Justice Cooke dated June 14, 2012.  *See id.* Ex. 27.

On June 29, 2012, Justice Smith extended, until further order of the U.K. Court or trial, the freezing order entered by Justice Cooke.  *See* Miller Decl. ¶ 67.

On July 13, 2012, Applicants applied for an order compelling discovery from BGC Brokers.  We are informed that the application was made pursuant to the U.K. Court's power to order disclosure from a third party who has become involved in wrongdoing, whether inadvertently or not, where that third party is unlikely to be a party to the substantive proceedings.  *See* Miller Decl. ¶ 68.  Applicants' order was granted by Justice Teare, and BGC Brokers was ordered to produce, by no later than September 7, 2012, *inter alia*, a schedule of all trades in the Argentinean Warrants from November 2010 to August 2011.  *See id.* Ex. 12 at Schedule 1, 2.

On July 16, 2012, Applicants applied for an entry of a judgment of default against F.O. Firmly Oceans Corp., Natalia Demakova and Qast International S.A.  Justice Teare entered default judgment against the three defendants for $36.8, $19.9 and $16.9 million, respectively. *See id.* Ex. 28.

On July 18, 2012, a case management hearing was held before Justice Walker, in which trial in the U.K. Action was set for June 2013.  *See* Miller Decl. ¶ 70.

On September 7, 2012, BGC Brokers provided some discovery relating to its trading in Argentinean Warrants on behalf of the co-conspirators.  *See id.* Ex. 11; Ex. 13.  BGC Brokers acknowledged that the trades had been "procured by [Otkritie] (through Ruslan Pinaev" and that

12

OSL was not BGC Brokers' client for the trades. *Id.* Ex. 34. However, we are informed that BGC Brokers' disclosures were deficient in a number of respects. In particular, we are notified that BGC Brokers has refused to provide any substantive information concerning the role of BGC Financial in the Warrants transactions, even though it has identified BGC Financial as the source of hundreds of millions of Warrants, and even though it was ordered to provide "Bloomberg messages, emails, letters, and documents including trade tickets and pricing research" relating to each of its trades in the Warrants. *See id.* Ex. 12 at Schedule 1; Ex. 29; Ex. 30.

On September 27, 2012, Applicants applied for entry of a judgment of default against Kondratyuk. Justice Field entered default judgment against the defendant for $183 million. *See id.* Ex. 31.

On November 9, 2012, Applicants applied for default judgment against four other defendants connected to the Jemai family—Yevgueni Jemai, Irina Jemai, Jecot, and Vantax Limited. Default judgment was entered against Vantax, but denied as to the remaining three because, at the last minute, they entered appearances in the case. *See* Miller Decl. ¶ 74.

U.K. counsel has also advised that defenses have now been served by a number of defendants in the U.K. Action, including Urumov and Pinaev. Urumov and Pinaev have denied any wrongdoing. In particular, they assert that the instructions for the Warrants Fraud trades came from senior management of the Applicants; that the moneys received from Gemini were part of a commercial arrangement with Gemini; and that all dealings with Gemini were handled by Kondratyuk. *Id.* ¶ 75.

We are advised by U.K. counsel that they cannot issue demands against the New York-based Discovery Respondent because they are not subject to the U.K. court's jurisdiction. *Id.* ¶

13

76.   As a result, any efforts to obtain discovery would need to be processed pursuant to the Hague Convention; would take many months, providing Urumov and his co-conspirators more time to dissipate the diverted funds; and would be unlikely to provide the same level of response as this Application.  *Id.*

In addition, U.K. counsel advises us that there would be no restrictions under U.K. law on Applicants' use of any discovery obtained through this Application in connection with any judicial proceedings relating to the U.K. Action.  *Id.*  ¶ 77.

**Other Proceedings**

Both the signing-on fee misappropriation described above and the Argentinean Warrants Fraud have been reported to the U.K. Financial Services Authority and the City of London Police.  *See id.* Ex. 6 ¶ 8.  Criminal investigations are ongoing in England, and have the Otkritie Entities' full cooperation.

As described above, Otkritie has also directed a criminal complaint against Urumov and his co-conspirators to Swiss authorities.  *See id.* Ex. 6 ¶ 10.  On November 21, 2011, one of Urumov's suspected co-conspirators, Kondratyuk, was arrested in Zurich.  *See id.* Ex. 6 ¶ 14.

On November 25, 2011, Kondratyuk appeared before a Swiss magistrate and was remanded into custody, where he remains, on suspicion of fraud and money laundering.  *See id.* Ex. 6 ¶ 64.  The Geneva Public Prosecutor has frozen cash assets in Switzerland of nearly $50 million as well as property assets worth in excess of $17 million.  *See id.* Ex. 6 ¶ 15.

Applicants have commenced related proceedings in jurisdictions such as Hong Kong, Luxembourg, Israel, and the Bahamas. *See, e.g.*, *id.* Ex. 32 ¶¶ 13, 17-19.

Doc. # DC-8107352 v.2

## SCOPE OF DISCOVERY REQUESTS

Applicants seek, through their proposed subpoenas (*see* Miller Decl. Exs. 1 to 2), to obtain essential, but limited discovery from the Discovery Respondent. Specifically, Applicants seek documents and testimony reflecting BGC Financial's trading in the Argentinean Warrants during the period immediately before and during the Warrants Fraud.

While Applicants have obtained some of this type of trading information through the BGC Proceeding, BGC Brokers has declined to produce documents and information they claim are in the possession of its N.Y.-based affiliate, BGC Financial. *See, e.g.,* Miller Decl. ¶ 72.

## ARGUMENT

28 U.S.C. § 1782 "authorizes, but does not require, a federal district court to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247, 124 S. Ct. 2466, 159 L.Ed.2d 355 (2004) ("*Intel*"). The Otkritie Entities respectfully submit that the Court should exercise its discretion in favor of granting discovery to the Applicants because the contemplated discovery meets all three of the statutory requirements and because the discretionary factors described by the Supreme Court in *Intel* weigh in favor of judicial assistance.

### I.    THE CONTEMPLATED DISCOVERY MEETS ALL THREE MANDATORY REQUIREMENTS OF § 1782

28 U.S.C. § 1782 sets forth three threshold requirements for obtaining discovery for use in foreign proceeding:

(1)    that the person from whom the discovery is sought either "resides" or is "found" in the district where the district court is located;

(2)    the discovery is for "use in a proceeding" before a "foreign tribunal"; and

(3)    the applicant is either a "foreign or international tribunal" or qualifies as an "interested person."

15

28 U.S.C. § 1782; *see also In re Application Pursuant to 28 U.S.C. § 1782 for an Order Permitting Christen Sveaas to Take Discovery From Dominique Levy et al. for Use in Actions Pending in Norway*, 249 F.R.D. 96, 105 (S.D.N.Y. 2008).  This Application thoroughly satisfies each of these statutory predicates.

### A.  The Entity from whom Discovery is Sought is "Found in" New York County and is therefore within the Judicial District

A corporation is "found in" a judicial district within the meaning of Section 1782 when the corporation has "systematic and continuous local activities with presence" in the district.  *In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007).  BGC maintains offices at 199 Water Street, One Seaport Plaza, New York, New York 10038, and does considerable business from the same location.  Accordingly, BGC is "found in" this judicial district within the meaning of Section 1782.

### B.  The Requested Discovery is "For Use in a Foreign Proceeding"

There are two primary questions for evaluating whether discovery requested pursuant to Section 1782 is intended for use in a "proceeding" before a "foreign tribunal"— (1) whether there is in fact a foreign proceeding for which the sought-after discovery might be used, and (2) whether the foreign proceeding is adjudicative in nature.  *See, e.g., Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998).

Here, both of these conditions are satisfied.  There is an ongoing civil litigation in the Commercial Court in the High Court of Justice, Queen's Bench Division, in London, England.  Applicants have filed claims for, *inter alia*, breach of contract, breach of fiduciary duty, bribery, deceit, tracing, accounting, and restitution.  *See generally* Miller Decl. Ex. 5.  Interim freezing orders have been granted and expanded.  *See id.* Ex. 19; Ex. 20; Ex. 21; Ex. 26; Ex. 27. The

requested discovery is being sought to help corroborate Applicants' suspicions regarding the co-conspirators' motives and intent; to identify still unknown perpetrators; and to recover Applicants' misappropriated funds.  Accordingly, the requested discovery is intended for use in a foreign proceeding as contemplated by Section 1782.

### C. Otkritie Entities are "Interested Persons" Within the Meaning of Section 1782 Because They are Litigants in the U.K. Action

The term "interested person" in Section 1782 is a term of art that is broadly construed, and there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256 (alteration in original); *see also In re Application of Bank of Cyprus PCL*, No. 10 Misc. 23, 2011 U.S. Dist. LEXIS 6082 at *6 (S.D.N.Y. January 21, 2011) ("Bank of Cyprus, as a litigant in the Cyprus proceedings, is an interested person within the meaning of § 1782."). As the entities seeking discovery here are the plaintiffs in the U.K. Action, they qualify as "interested persons" under the statute.

### II.    DISCRETIONARY FACTORS WEIGH IN FAVOR OF GRANTING DISCOVERY

Once an applicant meets the threshold requirements for obtaining discovery pursuant to Section 1782, the district court enjoys "wide discretion to determine whether to grant discovery and equally wide discretion to tailor such discovery to avoid attendant problems." *In re Application to Take Discovery from Dominique Levy*, 249 F.R.D. at 105-06 (quoting *Esses v. Hanania*, 101 F.3d 873, 876 (2d Cir. 1996)). "This discretion, however, is not boundless. Rather . . . district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of

17

assistance to our courts. . . .'" *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004) (quoting *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997), and *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)). Even if the discretionary factors do not strongly favor discovery, granting discovery is the preferred course as long as the mandatory statutory requirements have been met: "[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than simply declining relief outright." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 (2d Cir. 1995).

In *Intel*, the Supreme Court set forth four factors to inform district courts' discretion as to whether to provide judicial assistance pursuant to Section 1782. *See Intel*, 542 U.S. at 264. These include:

(1)     whether the persons from whom discovery is being sought are participants in the foreign proceeding;

(2)     the nature of the foreign tribunal, the character of the foreign proceedings, and the receptivity of the foreign entity to judicial assistance;

(3)     whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and

(4)     whether the requested information is unduly intrusive or burdensome.

*Id.*; *see also Schmitz*, 376 F.3d at 84. Applying these factors, judicial assistance is an appropriate exercise of this Court's discretion in this matter.

## A. Because the Entity from whom Discovery is Sought is not a Participant in the U.K. Action, Judicial Assistance is Warranted

Where the person or entity from whom Section 1782 discovery is sought is a party to the foreign proceeding, the need for judicial assistance diminishes. *Intel*, 542 U.S. at 264. This is because the foreign tribunal "has jurisdiction over those appearing before it, and can *itself* order them to produce evidence . . . ." *Id.* (emphasis added). By contrast, where, as here, foreign

18

litigants seek judicial assistance from non-participants to the foreign proceeding, Section 1782

relief is favored, the idea being that non-participants to the foreign proceeding "may be outside

the foreign tribunal's jurisdictional reach" and "their evidence . . . unobtainable absent § 1782(a)

aid." *Id.*; *see also In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) ("The

relevant inquiry is whether the evidence is available to the foreign tribunal.").

Discovery Respondent is located in the New York, and is not a party to the U.K. Action

or subject to the U.K. court's jurisdiction. *See* Miller Decl. ¶¶ 37, 76.  The evidence that they are

believed to possess is not easily available to the foreign tribunal or its litigants. Moreover, such

discovery will provide necessary information concerning the co-conspirators' pre-fraud sourcing

of Warrants.  Accordingly, the first *Intel* factor weighs in favor of granting the request for

judicial assistance.

## B.  The U.K. Action Where the Requested Discovery Would be Used is an Appropriate Subject of Judicial Assistance

The second discretionary factor under *Intel* advises federal district courts to consider "the

nature of the foreign tribunal," "the character of the proceedings underway abroad," and "the

receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial

assistance." *See Intel*, 542 U.S. at 264.  Here, these considerations weigh in favor of a grant of

judicial assistance.

The United Kingdom is a sister common-law jurisdiction that holds due process in just as

high a regard as the American court system.  *See, e.g.*, *In re Petition of Brierley*, 145 B.R. 151,

162 n.5 (S.D.N.Y. 1992) (noting that the United Kingdom shares our common law tradition and

that federal courts have repeatedly granted comity to foreign proceedings "where the foreign

proceeding was in the United Kingdom or in a country whose laws were derived from the United

19

Kingdom's laws"); *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807 (S.D.N.Y. 1992) (granting comity to U.K. bankruptcy proceeding upon recognition that U.K. courts have comparable due process protections).  The High Court of Justice, in particular, "hears the testimony of witnesses and receives documents in evidence, very much as American courts do." *In re Application of Guy*, 2004 WL 1857580, at *2 (S.D.N.Y. Aug. 19, 2004).

Furthermore, U.K. courts are receptive to foreign discovery.  The United Kingdom is a signatory of the Convention on Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, commonly referred to as the "Hague Evidence Convention." And the U.K.'s House of Lords has held that U.K. litigants are permitted to seek judicial assistance from the United States irrespective of whether the discovery sought would be discoverable under English law.  *See South Carolina Ins. Co. v. Assuranti Maatschappij "De Zeven Provincien" N.V.* [1987] 1 A.C. 24.   Indeed, U.K. tribunals routinely receive judicial assistance from federal courts in proceedings involving commercial litigants like the Applicants here.  *See, e.g., In re Application of Guy*, 2004 WL 1857580, at *2 (granting English administrators of a decedent's estate access to US discovery); *In re Application of Blue Oil Trading Ltd.*, 2009 WL 3353293, at *1 (W.D.N.C. Oct. 15, 2009) (granting discovery to defendant in breach of contract action before the High Court of Justice).  And counsel to Applicants in this proceeding have been advised by Applicants' U.K. counsel that they would be able to readily make use in the U.K. Action of whatever documentary evidence is obtained in these proceedings. *See* Miller Decl. ¶ 108.

### C. This Application is Brought in Good Faith

The third *Intel* factor – whether the applicant is attempting to "circumvent foreign proof-gathering restriction[s]" – likewise favors discovery.  Applicants are not "pursuing [the]

20

discovery in bad faith" or otherwise trying to thwart a denial of discovery by the foreign tribunal. *See Minatec Fin. S.A.R.L. v. SI Group, Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (describing this factor as "calculated to shield against an abuse or end run around a foreign jurisdiction's policies"). Applicants seek important discovery available in the United States concerning a U.S. entity's aggregation of Warrants on behalf of the co-conspirators.

As the Supreme Court has made clear, Section 1782 does not impose a foreign discoverability requirement, meaning it is irrelevant whether the requested discovery would be discoverable under the foreign tribunal's laws or whether the applicant has exhausted all other available methods of pursuing the same information. *See Intel*, 542 U.S. at 253 ("We now hold that §1782(a) does not impose . . . a [foreign-discoverability] requirement."); *see also In re Gushlak*, 2011 WL 3651268, at *4 (E.D.N.Y. Aug. 17, 2011) (citing *In re Application of Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997) ("In order to be entitled to discover under § 1782, the applicant is not required to 'exhaust' the discovery procedures available in the foreign court."). Applicants are simply trying to obtain crucial information in a forum where it may reside, and Section 1782 permits them to do just that.

## D. Applicants' Discovery Requests are Narrowly Tailored

As set forth above, Applicants' discovery requests, which are set out in the proposed subpoenas annexed as Exhibits 1 to 2 of the Miller Declaration, are narrowly-tailored. Applicants merely seek from the Discovery Respondent documents and testimony concerning trading in the Argentinean Warrants in the period before and during the Warrants Fraud.

Contemporaneous with this filing, Counsel for Applicants are providing copies of these papers to Respondent's General Counsel. Because Applicants' requests are narrowly tailored, Applicants do not anticipate any undue burden or expense to the Discovery Respondent.

21

However, to the extent these requests may be claimed to impose a burden, the Applicants will work with the Discovery Respondent to make any burden a manageable one.

## CONCLUSION

For the foregoing reasons, the Applicants respectfully request that this Court enter the accompanying [Proposed] Order granting their request for documentary and testimonial discovery as set out in Exhibits 1 to 2 of the accompanying Miller Declaration.

Respectfully submitted,

Dated: New York, New York
      November 19, 2012

By: _____
     Michael C. Miller
     Evan Glassman
     STEPTOE & JOHNSON LLP
     1114 Avenue of the Americas
     New York, New York 10036
     Tel: (212) 506-3900
     Fax: (212) 506-3950

     *Counsel for Applicants*

Doc. # DC-8107352 v.2